# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

vs.

John Doe aka
KEITH ROOTS, et al.,

Defendant

CR Nº: 1:06-cr-227-13 (RBW)

## MOTION TO RECONSIDER MAGISTRATE JUDGE'S DETENTION ORDER AND TO IMPOSE CONDITIONS OF RELEASE AND MEMORANDUM OF LAW

**COMES NOW D**efendant, Keith Roots, by and through his undersigned counsel Jensen Barber II, and moves this Court for an Order altering Mr. Roots's Conditions of Release and in support thereof states the following:

1. That Mr. Roots was arrested on/about September 6, 2006, and appeared for arraignment before Magistrate Judge Facciola on Counts One Two and Three of the Indictment[1].

2. The Government requested that Mr. Roots be detained pending trial pursuant to 18 U.S.C. 3142(f)(1)(c).

3. Mr. Roots was detained and the detention hearing was scheduled for September 11, 2006. The Government proceeded by proffer, outlining the allegations against Mr. Roots. The Government did not make an agent available to testify.

---

[1]

 Count One charges that between in or about September 2005 and July 2006, Darnell Jackson and twelve other defendants conspired to distribute and possess with intent to distribute a mixture of substance containing a detectable amount of phencyclidine (PCP) in violation of 21 U.S.C. § 846 and §§ 841 (a)(1) and (b)(1)(A). Count Two charges Mr. Roots along with 3 other defendants with possession with intent to distribute PCP on *March 10, 2006.* Count Three charges Mr. Root along with 3 other defendants with distribution of PCP on *March 10, 2006.*

Proceeding by proffer, the government stated that the conspiracy was headed by Darnell Jackson and Troy Hopkins. Flight records obtained by the government show that members of the conspiracy, including defendant, would fly in and out of Long Beach Airport on Jet Blue airlines. Members of the conspiracy would then purchase PCP from Tony Hilt. The PCP was usually purchased in one gallon quantities with a total of three gallons purchased per trip. The PCP was then given to couriers for transport back to the Washington metropolitan area. The leader of the couriers was Tinesha Adams. The PCP was smuggled back to Washington in lotion, shampoo or mouthwash bottles. The conspiracy coordinated approximately 20-30 flights per month over a 18- month period[2]. Mr. Roots allegedly traveled on two occasions to California.

4. On or about March 13, 2006, defendant Roots traveled to California with Jackson, using either a District of Columbia or Maryland non-driver's identification card. After Mr. Jackson purchased the PCP, they flew back immediately. On or about April 4, 2006, defendant Roots again traveled to California with Jackson. A government witness accompanied them on the trip. Jackson (not Roots) met with Hilt and purchased PCP. Defendant Roots, Jackson and the government witness returned to Washington the next day. Members of the alleged conspiracy, including defendant Roots, then met at the home of Bernie Hargrove, located at 10th Street, S.E., to dilute the PCP with starter fluid for sale in the Washington metropolitan area.

5. Magistrate Judge Facciola ordered Mr. Roots detained

6. Mr. Roots disagrees with the Magistrate Judge's detention ruling and is now requesting this Court review and reconsider the matter. Counsel submits that a more careful and through review of the factors in this case will lead this Court to conclude that reasonable conditions of release can

---

[2]This would equate to approximately 450 flights during the course of the conspiracy, i.e. 25 flights per month x 18 months. Mr. Roots allegedly participated in 4 flights or less than one % of these flights.

be fashioned which will assure that Mr. Roots is not a danger to the community pending a resolution

of the case on the merits.  Accordingly, Mr. Roots requests that reasonable conditions of release be

set in his case.

**ARGUMENT:**

7. There is no showing of  clear and convincing evidence that no conditions of release exist

which would provide reasonable assurance that Mr. Roots would pose a danger to the community.

8.  Mr. Roots was found by PSA to be eligible for the electronic monitoring program.

9.  Mr. Roots has no prior criminal record: no arrests, no convictions.

10.     The following conditions of release are available to the Court to

reasonably assure the safety of the community.

A**.  Release on PR**.

B. **Electronic Monitoring:** the defendant could reside at home with
his mother in Virginia and have a phone line available for
computerized monitoring.

C. **Home Detention**:  The defendant will remain at  his residence at
all times except to work, to visit the office of his local attorney, to
attend to medical emergencies, and to travel to and from his home.

D. **Supervised Release**: With weekly reporting to PSA. Violation
of these conditions for release, or if he were to commit any federal,
state or local crime during this period of release, he would be
immediately remanded, and a warrant for his arrest would be issued.

11.  Mr. Roots' lack of any criminal convictions when balanced against a very thin

Government case, clearly rebuts the statutory presumption of dangerousness-particularly since the

alleged leaders are now incarcerated and the operation is apparently shut down.[3]  The

---

[3]

 Counsel would note that the wiretap commenced in May of 2006. Therefore, to the extent that the Government's proffer
as to Mr. Roots is based almost entirely upon telephone conversations, the information was derived during a relatively

Government's evidence simply falls short of establishing by clear and convincing evidence that no condition or combination of conditions will assure Mr. Root's appearance in Court and the safety of the community.

WHEREFORE, it is respectfully requested that this Court set reasonable conditions as the Court deems appropriate to assure the safety of the community.

Respectfully submitted,
**Law Offices of J.E. Barber, PC**

_____
JENSEN E. BARBER II
Unified Bar 376325
400 7th Street, N.W.
Suite 400
Washington, D.C. 20004-2242
(202) 737-8511
Counsel for Keith Roots

DATED: September 26, 2006

short time.

5

## MEMORANDUM OF LAW

### A. THE RELEVANT LAW

18 U.S.C. §3142 governs the procedure that must be followed in making the determination as to whether a defendant shall be released or detained pending trial.   The Act requires the release of a person facing trial under the least restrictive condition or combination of conditions that will reasonably assure his appearance as required and the safety of the community.  *United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991) , *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

Section 3142(g) of the statute specifies various factors that must be considered in making the determination as to whether conditions of release exist that will reasonably assure the appearance of the person and the safety of the community.  These factors are:

> *(1) the nature and the circumstances of the offense charged;  (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the [defendant] was on probation, on parole or on other release pending trial, sentencing, appeal, or completion of [a] sentence; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.* 18 U.S.C. §3142(g).

6

The weight of the evidence is the least important factor. *Gebro, supra* 948 F.2d at 1121, *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

The Bail Reform Act requires that a finding of dangerousness be proved by "clear and convincing" evidence produced by the government.  The clear and convincing evidence requirement imposes a "heavy burden" on the government.  *Motamedi*, supra, 767 F.2d at 1406.  If that burden is not met reasonable bail must be set.  "The wide range of restrictions available ensures, as Congress intended, that very few defendants will be subject to pretrial detention." *United States v. Orta*, 760 F.2d 887 (8th Cir. 1985).

As stated by the Second Circuit in *United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985):

> The `clear and convincing evidence' with respect to a defendant's danger to the community required by §3142(f)(2)(B) means something more than `preponderance of the evidence' and something less than `beyond a reasonable doubt.'  See *Addington v. Texas*, 441 U.S. 418, 431, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323 (1979).  To find danger to the community under this standard of proof requires that the evidence support such a conclusion **with a high degree of certainty**.  760 F.2d at 405.  (Emphasis added).

In *United States v. Dominguez*, 783 F.2d 702 (7th Cir. 1986), the court vacated the district court's detention order. The court held:

> A defendant cannot be detained as dangerous under §3142(e), even if the presumption is not rebutted, unless a finding is made that no release conditions `will reasonably assure...the safety of the community ...' .  **That finding cannot be based on evidence that he has been a danger in the past, except to the extent that his past conduct suggests the likelihood of future misconduct.** (Emphasis added)

The government is put to such a heavy burden, and the Court is required to exercise such

7

severe restraint, because in determining "dangerousness" the Court is called upon to make the most

difficult of findings. As noted by the Court in *United States v. Perry*, 788 F.2d 100 (3rd Cir. 1986):

> (T)he dangerousness determination involves a prediction of the
> detainee's likely future behavior.  Such a prediction explores not the
> external world of past events but the inner territory of the detainee's
> intentions.  By it's very nature such a prediction is a far more
> speculative undertaking than the reconstruction of past events.
> Moreover, in the only other context in which the American judicial
> system, state or federal, is asked to make a prediction of future
> dangerousness -- the confinement of the mentally ill who are a
> danger to themselves or others-- the prediction is made with the
> assistance of medical professionals who have received scientific
> training in making such a prediction based upon clinical observation.

*tamedi, supra*, 767 F.2d at 1405; *Herzog v. United States*, 75 S. Ct. 349, 351, 99 L.Ed.

 1299 (Douglas, Circuit Justice 1955); see *United States v. McGill*, 604 F.2d 1252, 1255 (9th Cir.

1979), cert. denied 444 U.S. 1035, 100 S.Ct. 708 (1980).

The Supreme Court has stated unequivocally:

In our society,  liberty is the norm, and detention prior to trial or

 without trial is the carefully limited exception.  *United States v. Salerno*, 481 U.S. 739, 755, 107 S.Ct.

2095, 2105, 95 L.Ed.2d 697 (1987).  If not carefully circumscribed, preventive detention has the

potential to seriously undermine the presumption of innocence.  *United States v. Salerno*, *supra*, 481

U.S. at 763, 107 S.Ct. at 2110 (Marshall, J, dissenting).  That is why the legislative history emphasized

that the Bail Reform Act applied to only a small and readily identifiable segment of pre-trial criminal

defendants.  For as Chief Justice Vincent wrote in *Stack v. Boyle*, 342 U.S. 1, 4, 72 S.Ct. 1, 3, 96 L.Ed.

3 (1951), "unless the right to bail before trial is preserved, the presumption of innocence, secured only

after centuries of struggle, would lose its meaning."  Recently, Judge Vincent L. Broderick, United

States District Judge for the Southern District of New York, put the point eloquently:

8

*Pretrial detention can create -- and in many circumstances has created -- crises of mammoth proportions, creating problems for every element of the criminal justice system: those charged with crime; defense counsel; pretrial services and probation officers; judges; prosecutors; marshals; and the Bureau of Prisons.*

*... We detain people today who need not be detained -- people who pose neither the threat of flight nor threats to the community. Until we develop a more rational approach to the question of pretrial detention ... the crisis will continue.*

*Unfavorable consequences arise from overuse of pretrial detention, among them the following (by no means an exhaustive list):*

*1)    Defendants are detained who are never ultimately convicted.[4]*

*2) Defendants who are incarcerated cannot as effectively assist their counsel in preparing for trial or plea.*

*3)    Where supervision in the community is feasible, the detention of nonviolent defendants who pose risks neither of flight nor of danger to the community may tend to injure rather than to protect society, since possible rehabilitation of the detainees is foregone.*

*4)    Large numbers of pretrial detainees strain the capacity of detention facilities.*

*5)    Defense attorneys often find it difficult or impracticable to travel to detention facilities, to connect with shuttled clients, or to meet*

---

[4] Department of Justice research indicates that defendants in state court prosecutions detained in prison until their cases were disposed of were convicted and received prison sentences in only 39 percent of the cases. 2 U.S. Department of Justice, Bureau of Justice Statistics *National Update* #3 at 3 (Jan. 1993). This low conviction rate, flowing from problems in the selection, prosecution, and trial of such cases, has occurred in spite of the disadvantages of incarcerated prisoners in assisting in their own defense. While the Federal conviction rate for defendants detained pretrial is undoubtedly much higher, it is nonetheless sobering to consider that we may be detaining pretrial persons, presumed innocent, who will never be convicted.

9

> *confidently with clients in detention facilities without fear of eavesdropping.*
>
> *6) Transferring pretrial detainees between distant detention facilities and the courthouses strains the facilities of the Marshals Service. Prisoners must be shuttled back and forth at great expense and increased risk of escape. The high cost of pretrial detention, including security protection and transportation, reduces the funds which might otherwise be available for more productive criminal justice efforts [$52.13 per day].*
>
> *7) When lockdowns or headcounts occur in detention facilities courts must without advance notice readjust their often-crowded calendars.*
>
> *We must never flinch from pretrial detention in situations which call for it -- where there are foreseeable risks of flight or of danger to members of the community. But we should not overuse it. Today we are detaining pretrial many people who will not flee and are not dangerous. Doing this creates a myriad of problems: it flies in the face of justice. It is time for those who are actively involved in and truly committed to the criminal justice process to make our voices heard.*

57 *Federal Probation* 4, 5, 7-8 (March 1993) (Footnote in original).

At some point, incarceration without the due process associated with a full-blown criminal trial becomes punitive and violates the Due Process Clause of the Fifth Amendment to the United States Constitution. *United States v. Salerno, supra*, 481 U.S. at 747, 107 S.Ct. at 2101-02; *United States v. Accetturo*, 783 F.2d 382, 387-388 (3d Cir. 1986); *United States v. Vastola*, 652 F.Supp. 1446, 1447-1448 (D.C.N.J. 1987). In *Vastola*, Judge Brottman wrote:

> [A]t some point due process may require a release from pre-trial detention...' *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986); *see also United States v. Claudio*, 806 F.2d 334 (2d Cir. 1986). The factors to consider in finding that such a release is required include among others: `length of detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has needlessly added to the complexity.' *Accetturo*, 783 F.2d at 388.

10

> The length of detention is critical due to the `crucial liberty interest at stake.' *United States v. Suppa*, 799 F.2d 115, 120 (3d Cir. 1986) (citation omitted); *see also United States v. Perry*, 788 F.2d 100, 114 (3d Cir.), *cert. denied*, __ U.S. __, 107 S.Ct. 218, 93 L.Ed.2d 146 (1986) (`the grave invasion of the most fundamental of all personal liberties that occurs when preventive detention is ordered').

Release conditions available include curfews, travel restrictions, reporting requirements, the use of electronic monitoring systems and third party custody.    See 18 U.S.C. §3142(c); *United States v. Traitz*, 897 F.2d 322, 326 (3d Cir. 1986); *United States v. Ojeda Rios*, 846 F.2d 167, 169 (2d Cir. 1988).

B. THE RELEVANT FACTS

<u>1. The Nature and Circumstances of the Offenses Charged</u>

Mr. Roots was arrested, without any resistance or incident, based upon an arrest warrant, derived from a sealed indictment. The indictment charges him with conspiracy to distribute and possess with intent to distribute  some undetermined amount of a controlled substance (PCP)    Mr. Roots was not armed at the time of his arrest, nor were any weapons discovered.

<u>2. The Weight of The Evidence</u>

While this is deemed to be the least significant factor to be weighed in this Court's decision, *Gebro, supra* 948 F.2d at 1121, it does bear note that the weight of the evidence in this case is anything but overwhelming against Mr. Roots.

Other factors which the Court must consider weigh in favor of release. There is nothing in the record, nor could there be, suggesting any concern regarding Mr. Roots's  physical and mental condition; his family ties are "strong," and he has no criminal record.

11

## C. AVAILABLE CONDITIONS OF RELEASE

We request that the Court modify the order of release and set bail for Mr. Roots under the normal conditions pursuant to 18 U.S.C. §3142(c)(B), which requires the implementation of the "least restrictive further condition, or combination of conditions . . . "

.    ## D.  CONCLUSION

On the question of detention it is the prosecution's burden to establish that no release condition or combination of conditions will reasonably assure the safety of the community. The prosecution must establish dangerousness by clear and convincing evidence. Only if the prosecution carries its burden that no release conditions will reduce the risk dangerousness to the community, is detention appropriate.

The Court should give great weight to a nonexistent criminal history.

While this case is one of great import to the government, however, the seriousness of an offense can never, in and of itself, justify the detention of one charged with a crime. Rather, it is simply a factor to be weighed with other factors in determining if a particular defendant poses a danger to the community, or else every defendant in a serious case would be detained regardless of other considerations. That, of course, is not the law.

We respectfully urge that the Court grant Mr. Roots modified conditions of release.

Respectfully submitted,
LAW OFFICES OF J.E. BARBER, PC


_____
Jensen E. Barber II
400 7th Street, N.W.
Suite 400
Washington, D.C. 20004-2242
(202) 737-8511

12

## CERTIFICATE OF SERVICE

**THIS IS TO CERTIFY** that a true and correct copy of the foregoing was served electronically on Elisa Poteat, Esquire, Office of the US Attorney, 555 4th Street, NW, Washington, D.C. 20001 via the Court's electronic filing system this 26th day of September 2006.

_____
JENSEN E. BARBER II


cc: Mr. Roots
    DC Jail
    1901 D St, SE
    Washington, D.C. 20003